THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES LEE JEFFERSON, Defendant-Appellant.

First District (5th Division) No. 1—86—2525

Opinion filed April 28, 1989.—Rehearing denied June 20, 1989.

498

PINCHAM, J., dissenting.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marie Quinlivan Czech, Special Assistant State's Attorney, and Inge Fryklund and Patrick M. Brady, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Defendant, James Lee Jefferson, was convicted after a bench trial of residential burglary and sentenced to 12 years' imprisonment. He argues on appeal that his guilt was not proven beyond a reasonable doubt because there were significant discrepancies in the witness' identification and that there was stipulated evidence that defendant's shoe size was larger than that of the shoe prints found outside the burglarized residence. Defendant also argues that he was denied a fair trial because the trial court did not give weight to the stipulation concerning his shoe size.

Richard M. Sandrock testified that when he returned from a trip to his home at 723 Forest Avenue in Wilmette, he discovered that television and stereo equipment was missing.

Lisa Hinchcliff testified that about 2 a.m. on December 29, 1985, she returned home to 727 Forest Avenue in Wilmette. She noticed that the lights were on next door at the Sandrock home, and she went to the window to look more closely. From 40 feet away, she clearly saw two black men in the kitchen and the family room of the Sandrock home. One of the men was trying to pick up a television in the family room, and the other man was holding another television. One man, whom she later identified as defendant, was approximately

5 feet 10 inches tall, was big and husky, wore a green-hooded sweat shirt and a jacket, had big sideburns and was not clean shaven. The other man was taller, thinner, had a darker complexion, was clean shaven and was wearing nondescript clothing. She watched from her room for two minutes and then went to the kitchen to call the police. While she was on the telephone with the police, she looked through the kitchen window at the men. Most of the time she only saw defendant's profile but she also saw the front of his face various times. She observed the burglars for a total of four minutes.

At the police station, Hinchcliff gave a detailed description of the men. She said that defendant had sideburns that covered most of his cheeks and that the rest of his face was not clean shaven with some straggly chin hair. She also said that he was relatively light complected and that the other man was very dark complected. She did not tell the police that the burglar had a moustache or full beard, which she did not see. She met with an officer to make up a composite of the man identified later as defendant. The police showed her an array of seven or eight photographs, and she pointed out one that looked like the burglar in the family room except his facial hair differed. She was not sure that the burglar had as much of a beard as depicted in the photograph and felt that his sideburns were a little fuller than depicted. The color of the skin in the photograph also appeared darker than what she had observed. She requested to see more photographs and viewed hundreds in trays the next day. She did not see either of the two burglars in those photographs but then reviewed a book of photographs in which she saw a photograph of defendant. This photograph more closely resembled the burglar than the earlier photograph she had tentatively identified because the sideburns appeared fuller and longer, the skin appeared lighter, and the hair was sticking up.

On January 3, 1986, Hinchcliff picked defendant out of a lineup. His facial hair was less grown in around the side of the jaw and chin and less full than the sideburns, but defendant had a full beard and moustache. Hinchcliff had lived in Wilmette, which had few black residents, since she was in second grade. But she stated in a response to a question whether she saw black people often that she frequently traveled downtown.

Wilmette police officer Kenneth Rydz testified that Hinchcliff told him upon his making a composite of one of the suspects that he had pronounced sideburns and that the hair on the chin and lip looked scruffy. However, she was not sure whether the chin was scruffy, although she was positive about the sideburns. She never said that the

burglar had a beard or moustache. Rydz asked defendant's family for clothing for defendant to wear in the lineup, and they brought him gym shoes, socks and a sweater.

Julia Rochelle Jefferson, defendant's wife, testified that on December 28, defendant came home at 8:30 p.m. and remained there all that night.

A stipulation was entered that defendant was 6 feet 1 inch tall and weighed 210 pounds. Another stipulation was entered which stated that: (1) a police officer observed two separate sets of shoe prints at the burglarized home, both of which proceeded from the alley in the rear of the residence to the kitchen window and then away from the back door to the alley; (2) the officer concluded that the point of entry was the kitchen window and that the burglars exited through the back door; (3) the officer measured the shoe prints and one measured nine inches in length and three inches in width, and another measured 9½ inches in length and 3½ inches in width; (4) the shoe of defendant measured over 12 inches in length; (5) the officer concluded that the shoe of defendant did not make the two measured footprints; (6) the officer was unable to see the entire front of the second shoe print; (7) the officer concluded that the two shoe prints may or may not have been the same.

The trial court found that the witness' identifications of defendant were consistent and that her recollections were good. The trial court also referred to the gym shoes supplied by defendant's family and noted that the shoes may or may not have measured up to the impressions that were found on the premises. Defendant was found guilty of residential burglary, his motion for a new trial was denied, and he was sentenced to 12 years' imprisonment.

Defendant argues that his guilt was not proven beyond a reasonable doubt because of exculpatory shoe print evidence and because of the following discrepancies in the identification of defendant by the eyewitness: (1) defendant was three inches taller than she had described; (2) defendant's complexion was not light as she had described; and (3) defendant had a beard and moustache although the witness had described him as having big sideburns and not being clean shaven in other areas. Defendant also relies upon the fact that Hinchcliff grew up in a white suburb. Defendant also argues that the shoe prints at the scene of the crime could not have been made by him according to the police officer who made the measurements.

■ A vague, doubtful, or uncertain identification will not support a conviction. (*People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.) Hinchcliff's identification of defendant was positive and did not

waver. She had an adequate time to view defendant and was very conscientious about viewing police photographs to make certain that she identified the correct man as the burglar. The testimony of a single credible witness with ample opportunity to make a positive identification is sufficient evidence to convict. (*People v. Gomez* (1982), 107 Ill. App. 3d 378, 381, 437 N.E.2d 797.) While she did not identify the burglar as having a beard, she identified him as having sideburns that covered most of his cheeks. The discrepancies were not significant enough to find a reasonable doubt of defendant's guilt.

■ The shoe print evidence did not exculpate defendant. The trial court could have found that one of the sets of shoe prints belonged to defendant. The stipulation was that the officer found the shoe prints to measure 9 and 9½ inches in length. However, because the photographs of the shoe prints indicated a possible length of greater than nine inches and because the entire shoe in at least one set did not make an impression in the snow, the actual shoe length could have been greater than nine inches. The officer concluded that he could not see the entire front of the second shoe print, so the conclusion that the shoe length could have been longer than nine inches is not at variance with the officer's conclusion and is consistent with the possibility that defendant made the shoe print. The officer also concluded that defendant's shoe did not make the two measured shoe prints. However, the trial court was not required to accept the officer's conclusion as authoritative. Furthermore, it could have been concluded that even if defendant's shoe prints were not found outside, he still could have burglarized the residence because there was no showing that the shoe prints were made by the burglars.

The judgment of the circuit court is affirmed.

Affirmed.

COCCIA, J., concurs.

JUSTICE PINCHAM, dissenting:
I dissent.

I

THE PREFATORY GROUNDS FOR REVERSAL

The defendant's burglary conviction and 12 years' imprisonment sentence should be reversed because:

(1) The circumstances of the witness' observation of the bur-

glary offenders were not conducive to an accurate or reliable identification;

(2) the description of the burglary offender that the witness gave the police immediately after she observed him was not a description of the defendant, and more importantly, the description was diametrically and glaringly contrary to the defendant's description;

(3) the defendant's conviction is based solely on an uncertain, unconvincing, doubtful, inaccurate, single, uncorroborated identification;

(4) the trial court not only completely ignored and rejected the uncontradicted evidence that the burglars' footprints in the snow to and from the burglarized premises could not possibly have been made by the defendant, but, also, the trial court created its own facts regarding the footprints, which were not in evidence, and then improperly relied on its evidentially unsupported created facts in finding the defendant guilty; and

(5) not only does the State's evidence fail to prove the defendant's guilt beyond a reasonable doubt, but, also, the State's evidence proves beyond a reasonable doubt that it was not the defendant who committed the burglary offense.

For these foregoing reasons, the defendant's conviction, sentence and affirmances thereof constitute a grave miscarriage of justice. The judgment and sentence should therefore be reversed.

## II

### THE LEGAL STANDARDS GOVERNING APPELLATE REVIEW

In reversing convictions predicated solely on single uncorroborated identification testimony, the following eloquently pronounced guiding principles of the Supreme Court in *United States v. Wade* (1967), 388 U.S. 218, 228-29, 18 L. Ed. 2d 1149, 1158-59, 87 S. Ct. 1926, 1933, are applicable: "[I]dentification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the *annals of criminal law are rife with instances of mistaken identification.* Mr. Justice Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? *The identification of strangers is proverbially untrustworthy.* The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of

ancient criminal procedure.' The Case of Sacco and Vanzetti 30 (1927). A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that '[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all factors combined.' Wall, Eye-Witness Identification in Criminal Cases 26. Suggestion can be created intentionally or unintentionally in many subtle ways. And *the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial,* and thus his susceptibility to suggestion the greatest. Moreover, '[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' " (Emphasis added.)

Many people, even in serene atmospheres, have been approached by a total stranger and mistakenly taken for someone else, and upon recognizing the error, the stranger is prompted to say, "Oh, I'm sorry, I thought you were someone else." And just as many people have themselves made that same mistake. People frequently say and hear, "Oh, he looks like someone else I know." The difficulty and often the inability to accurately describe a past seen stranger and to later correctly identify that stranger are problematic and uncertain realities. Erroneous and mistaken identifications, however honest and well intentioned they may be, plague the justice system. Criminal convictions predicated solely on uncorroborated identification testimony cause justified consternation. Indeed they should. Such convictions inherently fail to unequivocally instill a completely satisfying certainty of justice.

Faulty and inaccurate identifications continue to cause unjust convictions and imprisonment of innocent people and continue to prompt valid concerns because of such injustices. Of equal concern, certainly, is the fact that such erroneous convictions do not rid the community of or protect the community from the onus of the real unapprehended culprits, who continue to wreak havoc on their victims. Simply convicting and imprisoning just anyone for the commission of a crime, as was obviously done in the case at bar, does not redress the victim's grievance or safeguard the community.

In a bench trial, of course it is for the trial judge to determine the credibility of a witness' identification testimony, to weigh the evidence

and to draw reasonable inferences therefrom. (*People v. Berland* (1978), 74 Ill. 2d 286, 305-06; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 615, 378 N.E.2d 380.) On review, however, the trial court's finding and judgment will be set aside if the proof is so unsatisfactory, improbable or implausible as to justify a reasonable doubt of the defendant's guilt. (*People v. Slim* (1989), 127 Ill. 2d 302; *People v. Johnson* (1986), 114 Ill. 2d 170, 190; *People v. Collins* (1985), 106 Ill. 2d 237, 261; *People v. Sakalas* (1980), 85 Ill. App. 3d 59, 68.) Clearly, the proof in the case at bar is so unsatisfactory, improbable and implausible that it justifies a reasonable doubt of the defendant's guilt.

In affirming the appellate court's reversal of the defendant's armed robbery, home invasion and unlawful restraint conviction because the identification evidence was unsatisfactory in *People v. Ash* (1984), 102 Ill. 2d 485, 492-94, the supreme court stated: "A conviction cannot be deemed to be sustained beyond reasonable doubt by the evidence if identification of the accused was vague and doubtful," and that, "An issue here is whether the evidence was sufficient to show Ash guilty beyond a reasonable doubt. Quoting from *People v. Jordan* (1954), 4 Ill. 2d 155, 156, we recently stated that 'it is our duty, where a verdict of guilty is returned by a jury \*\*\* not only to carefully consider the evidence but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged.' "

Our supreme court recently pointed out in *Slim* that in assessing identification testimony Illinois courts have used the criteria pronounced by the Supreme Court of the United States in *Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375. There the Court held that the criteria to be considered in evaluating identification testimony include:

"[1] the opportunity [the victim has] to view the criminal at the time of the crime,

[2] the witness' degree of attention,

[3] the accuracy of the witness' prior description of the criminal,

[4] the level of certainty demonstrated by the [victim] at the [identification] confrontation, and

[5] the length of time between the crime and the identification confrontation." 409 U.S. at 199, 34 L. Ed. 2d at 411, 935 S. Ct. at 382.

Application of these foregoing principles to the case at bar compels reversal of the defendant's conviction.

III

### THE CIRCUMSTANCES OF THE WITNESS IDENTIFICATION

The opportunity the witness had to view the offenders during the commission of the burglary was most inadequate, and the witness' prior activities earlier that morning and during the previous evening merit questioning her degree of attention. The totality of the circumstances surrounding the witness and her observations of the burglary offenders were not conducive to an accurate or reliable identification by the witness.

Lisa Hinchcliff, the only eyewitness to the burglary, testified that she lived in Wilmette, Illinois, with her parents and three sisters. It is apparent that her parents and sisters were out of the city, as were her neighbors, during the post-Christmas and pre-New Year holiday seasons, when her neighbor's home was burglarized. Lisa had just turned 18 years of age on December 6. On Saturday night, December 29 at about 8:30 p.m., Lisa and her girl friend, Judy Sheehan, also age 18, went out to various taverns and night spots, such as Mothers, in the Rush Street area in Chicago, where they danced and Judy drank alcoholic beverages. Lisa testified that Judy drank so much alcohol that she passed out, yet Lisa stated that she did not imbibe any alcohol whatever that evening and morning. This of course was possible. It would seem, however, to be somewhat unusual for two late-teenage young ladies to go out together to taverns in the Rush Street area on a Saturday night, during the Christmas and New Year holiday seasons and one of them becomes so inebriated that she passed out, while the other not drink a single alcoholic beverage during the entire evening and morning hours.

Lisa testified that she and Judy returned to her home in Wilmette from the Rush Street area about 2 a.m. and that Judy went into Lisa's bedroom, where, on Lisa's bed, she passed out from her intoxication.

Lisa knew that her neighbors were out of town, and she noticed that the lights were on in the neighbor's house. Lisa looked through her bedroom window and saw two men in the family room and kitchen of her neighbor's house, about 40 to 50 feet away. Lisa stated that her neighbor's house "was well lit." This too was also possible, but here again, it would seem to be somewhat unusual that nighttime burglars of an unoccupied residence would "well" light up the premises they are burglarizing.

Lisa testified that she said to Judy, "Judy, there's two men next door. What do you think I should do?" Lisa stated that Judy replied,

"Do whatever you want to do," that Judy didn't really care. Apparently, Lisa had never seen either man before and she never saw them on the morning in question at a distance any closer than 40 to 50 feet, through the windows of her house and her neighbor's house.

Lisa testified that she was able to observe only the profile of one of the men, and only from his waist up, for a period she described as two minutes. It would appear that two minutes would be an inordinate amount of time for a burglar to stand in an open window in a lighted room of premises that he is burglarizing, even though it perhaps appeared to Lisa to have been that long. Lisa related that one of the men held a television set, while the other attempted to pick up another television set in the family room.

Lisa went to her kitchen, where she reported the burglary to the police by phone, during which time she also observed the burglars in her neighbor's home for a period she described as about a minute. The lights were off in Lisa's house until Judy awakened and went to the bathroom and turned on the bathroom light. At that time one of the burglars turned around and Lisa saw his face. Lisa testified that this man had big sideburns but that he did not have a beard or a mustache. Lisa identified this man at trial as the defendant James Lee Jefferson. During the greater portion of the time that Lisa was observing the men as they moved about in her neighbor's house, she was only able to see the men's profiles. Mostly profile observations of persons burglarizing a residence at 2 o'clock in the morning, through a neighbor's family room and kitchen windows, from a bedroom and kitchen window 40 to 50 feet away by a person who has just returned home from a six-hour escapade in Rush Street bars are far from ideal circumstances for making an accurate or reliable identification.

By reason of these foregoing circumstances, the instant case miserably fails the first and second criteria of *Biggers* and *Slim* in evaluating identification testimony, *i.e.*, "[1] the opportunity [the victim has] to view the criminal at the time of the crime, and [2] the witness' degree of attention." *Biggers*, 409 U.S. at 199, 34 L. Ed. 2d at 411, 93 S. Ct. at 382.

## IV

### THE WITNESS' PRIOR DESCRIPTION OF THE CRIMINAL WAS AN EXTREMELY INACCURATE DESCRIPTION OF THE DEFENDANT

The case at bar also flunks the third test of *Biggers* and *Slim* in evaluating identification testimony, *i.e.*, "the accuracy of the witness' prior description of the criminal." (409 U.S. at 199, 34 L. Ed. 2d at

411, 93 S. Ct. at 382.) Lisa's prior description of the criminal to the police officers shortly after the burglary was an extremely inaccurate description of the defendant.

The burglars fled the premises and the area in what Lisa described as an older model, light color, beat up, General Motors car. The police arrived. Lisa went to the police station, where she gave a description of the burglars to an officer who, based thereon and pursuant to Lisa's directions, drew composite drawings of the faces of the two burglars. These two drawings are included in the record on appeal before us as People's exhibits Nos. 1 and 2.

Lisa was shown seven pictures at the police station from which she selected a picture of the defendant as resembling one of the burglars. The following day she was shown additional pictures at the Evanston police station and she picked the defendant's picture as closely resembling the burglar. Both these pictures are also included in the record on appeal as People's exhibits Nos. 3C and 4. The defendant was arrested on January 2, 1986, at which time his picture was taken. This picture also appears in the record before us, as People's exhibit No. 7. I later herein again refer to these pictures. Lisa picked the defendant out of a lineup on January 3, 1986, as one of the burglars.

A

### LISA'S GENERAL DESCRIPTIONS

Lisa originally described both offenders as black, and she also stated that both offenders had black hair and brown eyes. Lisa's ability to see and discern the color of the offenders' eyes under the above-described circumstances is questionable to say the least. More realistically, Lisa's statement that she could see that the color of the burglars' eyes were brown is ludicrous. Even more realistically, Lisa's description of the burglar's eyes as brown was predicated on her stereotype mentality that the offenders had brown eyes because they were black. She testified that she guessed the black offenders had brown eyes.

Lisa described the nondefendant offender at the police station and to the police artist as in his early 20's, 6 feet, 1 inch tall, weight—thin, build—thin, hair—black, facial hair—none (cleancut), complexion—dark, hat—none, coat—unknown. This offender was never arrested or identified.

The description of the burglary offender that Lisa gave the police at the burglary scene, at the police station and to the police artist,

which at trial Lisa said was of the defendant James Lee Jefferson, did not remotely or accurately describe him. More importantly, these descriptions were glaringly contrary to the defendant's description. Lisa's prior description of the burglar, whom she identified at trial as the defendant, and her prior description set forth in the record on appeal and which accompanies the police artist's composite picture, People's exhibit No. 1, is as follows:

## "PHYSICAL DESCRIPTION

| | |
|---|---|
| Sex: Male | Facial Hair: Sideburns |
| Race: Black | Complexion: Light |
| Age: 30's | Height: 5 feet 10 inches |
| Eyes: Brown | Weight: Med-heavy |
| Hair: Black | Build: Medium to heavy |

### CLOTHING

| | |
|---|---|
| Hat: None | Coat: Dark colored jacket |
| Shirt: Green hooded sweatshirt" | |

The only features of the defendant which fit the above descriptions were the defendant was a black male, with black hair and brown eyes and in his 30's. So are hundreds of thousands of other black males in Chicago, Cook County and the collar county area. None of the specific description features given by Lisa of the offender fit the defendant.

B

### THE DEFENDANT'S SIDEBURNS, MUSTACHE AND BEARD

Lisa told the officers that the offender had sideburns which covered his cheeks. She did not, however, tell the officers that the offender had a mustache or a beard. More importantly, Lisa admitted at trial:

"Q. You did, in fact, see a frontal view, a whole facial view of the individual who you say was James Jefferson in that house, correct?

A. Yes, I did.

Q. And when you saw that frontal view, you didn't see on that individual a full beard or a mustache did you?

* * *

A. No.

Q. Or a moustache?

A. No."

When the defendant was arrested on January 2, 1986, however, he had sideburns and a full-grown, lengthy beard and a thick mus-

tache, which he could not possibly have grown between 2 a.m., the Sunday morning of December 29, when Lisa saw the burglar, and Thursday, January 2, 1986, when the defendant was arrested. The police took the defendant's picture when he was arrested, People's exhibit No. 7, included in the record on appeal, and this picture clearly shows the defendant's beard and mustache. Thus, the State is compelled to concede that at all times relevant in this case, the defendant had sideburns, which Lisa saw, and that the defendant also had a mustache and beard, which Lisa, at the same time, did not see.

Lisa's description, accompanying the composite drawing, for "facial hair" only states "Sideburns." Moreover, Lisa's description of the unapprehended offender's "facial hair" was "none (cleancut)." Lisa obviously was keenly sensitive to and aware of the facial hair, or lack thereof, of the two offenders. Yet, she did not tell the officers that the offender, whom she at trial identified as the defendant, had a mustache or a beard. Therefore, Lisa's trial testimony of necessity was that she saw the defendant's sideburns, but that she did not also see the defendant's mustache and beard. But this is fallacious. The defendant quite persuasively argues that Lisa did not see his mustache and beard because he was not the burglar that she saw.

## C

### THE DEFENDANT'S PICTURES

While at the police station that Sunday morning after the burglary, the police showed Lisa seven pictures, one of which was of the defendant. Lisa selected the defendant's picture as resembling the burglar, but she was not sure that it was the burglar. This indeed borders on being a miraculous occurrence. I need not further comment beyond the statement itself, on the mathematical probability of a witness being shown only seven pictures in a police station shortly after a burglary, and just by some horrendous chance one of the seven pictures just happens to be a picture of the burglar and is selected by the witness as resembling the burglar. Under the totality of the aforementioned extremely inopportune circumstances in which the witness observed the offenders, this extraordinarily improbable and unusually odd picture identification becomes naturally suspect.

This picture of the defendant, chosen by Lisa as resembling the burglar, is included in the record on appeal as People's exhibit No. 3C. In this picture the defendant has wide, thick and long sideburns, and also a full-grown, lengthy beard, and also a mustache.

The six other pictures shown to Lisa at the police station are also

included in the record on appeal as People's exhibits Nos. 3A, 3B, 3D, 3E and 3G. The defendant's picture quite uniquely is the only picture in the group of seven with long, thick, wide sideburns. Equally, if perhaps not more significant, based on Lisa's other descriptive features of the burglar's complexion, height, weight, build and facial hair, none of the six persons portrayed in the other six pictures could possibly have been the burglar. None of these six persons remotely fits Lisa's description of the burglar.

The picture People's exhibit No. 3A is of a skinny black, late-teenage male, with a medium brown complexion, who has not yet even grown facial hair, sideburns, beard or a mustache. The picture People's exhibit No. 3B, is of a black male, dark brown skin complexion, who appears to be in his late 20's to early 30's and who appears to weigh approximately 230 pounds, whose sideburns do not cover his cheeks, but rather, whose sideburns do not even come below his ears. The picture People's exhibit No. 3D is of a corpulent, obese black male, medium brown complected, who appears to be in his mid to late 30's and who appears to weigh at least 300 pounds. He has an extremely thick and long mustache and a beard completely around his face and chin from his upper lip, mustache level downward. His sideburns, however, do not cover his cheeks but are down only to the bottom of his ears. His cheeks, between the bottom of his sideburns and the top of his beard at his chin, mustache level, are extremely clean shaven. Picture People's exhibit No. 3E is of a medium build, young, dark-complected black male who appears to be in his late teens or early 20's and who has no facial hair, sideburns, beard or mustache. Picture People's exhibit No. 3F is of a black male, medium to light brown complexion, who appears to be in his late 20's to early 30's, medium build, with a mustache, no beard and with sideburns only to the bottom of his ears. Picture People's exhibit No. 3G is of a black, medium build and medium brown complected male who appears to be in his late 20's to early 30's and who has a mustache, but who has no sideburns or beard. As stated, none of the six pictures, and, according to Lisa's description of the burglar, not one of the persons portrayed in the six pictures could possibly have been the burglar. Conversely, and uniquely, simply because of the defendant's long sideburns on the picture, his picture was the only picture shown Lisa that could possibly have fit Lisa's description of the burglar.

Even though Lisa picked out the defendant's picture, People's exhibit No. 3C, as only resembling the burglar, nevertheless, the police artist drew a composite picture of the burglar pursuant to Lisa's directions and description, People's exhibit No. 1. This, too, appears to

be somewhat odd. Having chosen the defendant's picture as resembling the burglar, there would then appear to be no need for a composite drawing of the offender. According to Lisa, her skepticism concerning the defendant's picture was not premised on his facial contour characteristics of the picture, but rather, was simply premised on the facial hair and color of the picture. The differences between the composite drawing of the burglar and the defendant's picture that Lisa selected are appreciable and quite noticeable. The composite drawing of the burglar, People's exhibit No. 1, is a full, thick, round, almost fat face, with exceptionally thick lips and large nose, whereas the photo picture of the defendant in People's exhibit No. 3 is a thin face, almost raw boned, with high cheek bones and medium or normal lips and nose. It is also meaningful that the composite drawing has long sideburns down on the cheeks but it does not have a beard or a mustache.

After Lisa selected the defendant's picture, People's exhibit No. 3, as resembling the burglar, and directed the police artist in drawing a composite picture of the burglar, the officers made no attempt to arrest the defendant. The following day Lisa looked at more pictures at the police station, ostensibly to see if she could be more certain in her picture identification of the burglar. The officers' failure to arrest the defendant after Lisa initially tentatively identified his picture as the burglar, and Lisa's subsequent viewing of additional pictures for a more certain selection, also appear to be somewhat strange, particularly since, according to Lisa, her tentative identification of the defendant's picture as the burglar was only equivocal because of the picture's color and the condition of the sideburn hair, and not because of the facial features or contour.

During this second picture viewing, Lisa saw another picture of the defendant, People's exhibit No. 4, which Lisa stated more clearly resembled the burglar than the defendant's picture People's exhibit No. 3C, which she had just selected the previous day as resembling the burglar.

Both pictures are in the record before us, and a mere glance at them clearly reveals that they are practically identical and are of the same person. The defendant has on a white short-sleeve T-shirt in both pictures, and the only difference in the two pictures is that in the first picture Lisa selected, People's exhibit No. 3C, the hair on the defendant's beard is not combed and is in disarray, whereas in the second picture Lisa selected, People's exhibit No. 4, the defendant's hair is combed and is not in disarray. In both pictures the defendant has long sideburns coming down from his temple over his cheeks. In

both pictures the defendant has a mustache. In both pictures the defendant has a long, full-grown beard.

If Lisa was uncertain of her identification of the defendant as the burglar from his picture People's exhibit No. 3C, she was, or she should have been, equally uncertain of her identification of the defendant as the burglar from his picture People's exhibit No. 4. The two pictures are realistically the same. The defendant urges, with merit, that Lisa was attracted to his second picture because it too had long sideburns, and because it possibly was the only picture she again saw with long sideburns, and also because this second picture of the defendant was possibly the only picture of a person whose picture she had seen the previous day.

The picture taken of the defendant by the police when the defendant was arrested on January 2, 1986, is also included in the record on appeal, as People's exhibit No. 7. This picture also has sideburns from the defendant's temple and covering his cheeks. In this picture the defendant also has a mustache and a full beard, which he could not possibly have grown between Sunday morning, December 29, 1985, when Lisa was supposed to have seen him burglarize her neighbor's house, and Thursday, January 2, 1986, when the police arrested him. Thus, in all three pictures of the defendant in the appeal record, the first and second pictures selected by Lisa and the picture of the defendant taken when he was arrested, People's exhibits Nos. 3C, 4 and 7, respectively, the defendant has a long, hairy beard and mustache. The police artist composite drawing of the burglar at Lisa's direction, however, does not have a beard or mustache, because, the defendant contends, he was not the man that Lisa saw in her neighbor's home and whom Lisa described to the police artist for the composite drawing.

Even though Lisa repeatedly testified at trial that when she looked in her neighbor's house, she could see "both these men clearly," "the front of his face at various times," his face "right in front of me," and that "I was trying to, you know, get a real close look, so I could tell the police what they [the burglars] looked like," as previously pointed out. However, Lisa also testified at trial that when she saw the frontal view of the person in the house, whom she identified at trial as the defendant James Jefferson, she did not observe a beard or mustache on that individual. The majority in the case at bar summarily dispels and discounts this grave and fatal disparity in Lisa's description by simply concluding that "she did not see" a mustache or beard on the offender's face, even though she saw the offender's sideburns. This is a totally unsatisfactory, irrational and

indeed an illogical resolution of this void discrepancy and variance.

D

THE DEFENDANT'S COMPLEXION

Lisa initially described to the police officers the offender that she saw in her neighbor's house, and whom she subsequently identified as the defendant James Jefferson, as light complected. "Complexion: light" is the complexion description which is set forth accompanying the police artist composite drawing of the offender. The police artist testified that Lisa told him that the offender was light complected. Accordingly, the artist related, he drew a light complexion on the composite drawing of the offender, People's exhibit No. 1, which is light complected. The police artist, a State witness, testified:

"Q. When you say, facial tone, is that complexion?

A. It's color or tone of complexion, yes.

Q. Is there another listing under there for complexion, color of complexion?

A. Yes. There's an F3.

Q. So that would be two different complexions in there to make that complexion, correct?

A. Sure.

Q. As you look at People's Exhibit No. 1 for identification, what tones did you put in for that complexion?

A. I didn't put any tones in there.

Q. You left it non-complected, correct?

A. Yes.

Q. Would it be fair to say that you can make a complexion or a skin tone as dark or as less dark as you possibly wanted to?

A. Well, to a point. The lightest I could make it is as you see it here in No. 1 because there are no facial tones inserted.
* * *

Q. When you showed Miss Hinchcliff these two particular things, she said, 'Yes. That looks the way the two men looked,' correct, 'complexion-wise?'

A. Yes.

Q. She didn't ask you to make the complexion on People's Exhibit No. 1 any darker at all, did she?

A. On No. 1?

Q. Right.

A. No.

Q. Because if she did, you would have done so?

A. Yes."

The pictures of the defendant James Lee Jefferson, in the record before us, People's exhibits Nos. 3C, 4 and 7, show that the defendant is not light complected; rather, he is black complected, the opposite of the light complexion attributed to the burglar by Lisa.

## E

### THE DEFENDANT'S HEIGHT

Lisa described the height of the burglar as 5 feet 10 inches tall. This was not the defendant's height. The prosecuting attorney stipulated that the defendant was 6 feet 1 inch tall, and the trial court concluded in its findings that the defendant was 6 feet 1 inch tall. Thus, there is also a fatal variance between Lisa's description of the burglar's height and the defendant's height.

## F

### THE DEFENDANT'S WEIGHT AND BUILD

Lisa described the burglar's weight as "medium—heavy" and his build as "medium to heavy," on a body frame 5 feet 10 inches tall. The prosecuting attorney stipulated that the defendant weighed 210 pounds, and the trial court also found that the defendant weighed 210 pounds. The defendant's full-length lineup pictures, People's exhibits Nos. 5A, 5B and 5C, taken on January 3, 1986, and the defendant's full-length arrest picture of January 2, 1986, People's exhibit No. 7, show that the 6-foot 1-inch tall, 210 pound defendant's weight and build are not "medium to heavy," rather he is slim and skinny. Again, Lisa's "medium to heavy" description of the weight and build of the burglar fatally varies from the slim and skinny weight and build of the defendant.

Neither specific descriptive characteristic of the burglar, mustache, beard, complexion, height, weight or build, given by Lisa was descriptive of the defendant. Lisa's specific descriptive characteristics of the burglar established that the defendant James Lee Jefferson was not the burglar. Lisa's prior description therefore fails the third test of *Biggers* and *Slim, i.e.*, the witness' prior description of the criminal does not accurately describe the defendant.

A police officer's acquisition of an offender's description from a witness serves absolutely no useful purpose if a conviction like the one in the case at bar can be obtained and then affirmed on appeal,

except perhaps to demonstrate how needless an accurate description is to a prosecutor's obtaining and affirming a conviction, when there has been an inaccurate description of the offender.

## V

### THE IDENTIFICATION CONFRONTATION
### AND
### THE TIME BETWEEN THE CRIME
### AND
### THE IDENTIFICATION CONFRONTATION

For the foregoing reasons, the fourth and fifth criteria of *Biggers* and *Slim* are necessarily wanting, or are inapplicable, *i.e.*, "(4) the level of certainty demonstrated by the [victim] at the [identification] confrontation, and (5) the length of time between the crime and the identification confrontation." (*Biggers*, 409 U.S. at 199, 34 L. Ed. 2d at 411, 93 S. Ct. at 382.) Moreover, these two criteria do not aid and are really meaningless in determining whether the credibility of an identification is to be enhanced. These two criteria are of aid, however, in determining that the credibility of the identification is not to be enhanced.

Where the level of certainty demonstrated by the witness at the identification confrontation is weak, ambiguous or uncertain, such an identification is unsound and unreliable. If the only evidence of the defendant's commission of the offense is such a weak or equivocal identification, a conviction thereon cannot be obtained or sustained, and a prosecution solely on such an identification is unwarranted and will be unsuccessful. On the other hand, a level of certainty demonstrated by a witness at the identification confrontation should not enhance the credibility of the identification. If a witness is in fact mistaken at an identification confrontation, however honest and sincere, and however certain and positive the witness may be, the witness' certainty in the identification does not transform the witness' mistaken identification into a correct one.

For these same reasons, the length of time between the crime and the identification confrontation is an aid in affixing a lack of authenticity to an identification. But conversely, the length of time between the crime and the identification confrontation does not credit the identification. Here also, if the identification is in fact erroneous, whether made immediately or long after the commission of the crime, the period between cannot convert a mistaken identification into a correct one. Of course memories fade and appearances change during the

passing of time. Thus, the passing of time may itself discredit an identification. Conversely, an inaccurate identification in fact is not made credible or accurate simply because it is promptly made.

I have previously pointed out the unusual oddity of Lisa being shown seven pictures, one of which was of the defendant, shortly after the burglary and Lisa's selection of the defendant's picture as resembling the burglar. Regarding Lisa's certainty at the lineup identification, I rely on the language of the Supreme Court in *Wade* that "[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, [or his picture] he is not likely to go back on his word later on." *Wade*, 388 U.S. at 229, 18 L. Ed. 2d at 1159, 87 S. Ct. at 1933.

At trial Lisa thought it necessary to enhance her credibility in describing and identifying the black defendant. Her attempt to do so self-destructed. On cross-examination the defendant's attorney endeavored to establish Lisa's limited exposure to black people, presumably as a predicate for his argument that such limited exposure made it difficult for Lisa to describe the black burglar or identify the black defendant as the black burglar. Lisa anticipated this pursuit and argument and endeavored to foil it and thereby hopefully improve her believability.

In response to cross-examination questions, Lisa testified that she had lived in Wilmette since she was in the second grade, that not very many black people lived in Wilmette, that she attended Regina High School, at which there were around 200 students in each class and that there were only two black students at Regina. Lisa was then asked, and she testified:

"Q. Would it be fair to say you don't see Black people very often?

A. I go downtown all the time.

Q. When you go downtown all the time, what do you mean?

A. I take lessons downtown. I'm an art student."

Lisa did not testify that her trips or her art lessons downtown in any way involved observing or identifying black people.

## VI

### THE SHOE PRINT IMBROGLIO

The trial court completely ignored and rejected the uncontradicted evidence that the burglars' shoe prints in the snow to and from the burglarized premises were not made by the defendant. More egregious were the trial court's creation of its own facts regarding the

shoe prints in the snow and the defendant's ability to have made them, which were not in evidence, and then the trial court's improper reliance on its evidentially unsupported created facts in finding the defendant guilty.

Lisa testified that the burglars fled out of the back door of her neighbor's house to their car parked in the alley and sped away. The police arrived, and after talking to Lisa, the officers discovered that the gym shoes worn by the burglars left their shoe prints in the back-yard snow, where the burglars walked between their car and the bur-glarized residence. Two of the shoe prints were suitable for compari-son purposes. Pursuant to the officers' request, defendant's relatives brought the defendant clothing and gym shoes to wear in the lineup. The relatives did not know that the defendant's gym shoes were to be compared with the shoe prints from the yard of the burglarized prem-ises.

At trial, the State and the defendant stipulated and agreed to the following facts:

"1. That Wilmette Police Department Evidence Technician James P. Neweem processed a crime scene at 723 Forest Ave-nue, Wilmette, Illinois on December 29, 1985 at 3:30 a.m.

2. That Officer Neweem observed two separate sets of shoe-prints at that location, both of which proceeded from the alley in the rear of the residence to the kitchen window and then away from the back door of the residence back to the alley.

3. That Officer Neweem concluded that the point of entry of the offenders was the kitchen window described above and that the point of exit was the back door described above.

4. That Officer Neweem measured said shoeprints and found that one shoeprint suitable for comparison measured nine inches in length and three inches in width and that the second shoeprint suitable for comparison measured nine and one-half inches in length and three and one-half inches in width.

5. That Officer Neweem compared the two suitable shoe-prints described above with the shoe of the defendant James Jefferson and found that the defendant's shoe measured over twelve inches in length.

6. That Officer Neweem concluded that *the shoe of defend-ant James Jefferson did not make the shoeprints number 1 and number 2 in the snow leading to the point of entry and \*\*\* leaving from the point of exit.*

7. That Officer Neweem was unable to see the entire front of shoeprint number 2.

8. That Officer Neweem concluded that shoeprint number 2 may or may not be the same as shoeprint number 1.

9. That Officer Neweem Xeroxed the shoe of defendant James Jefferson a copy of which Xerox is attached hereto as Defendant's Exhibit No. 1 and compared the Xerox to the largest of the two shoeprints recovered a copy of which is attached hereto as Defendant's Exhibit No. 2, and that both Exhibits No. 1 and No. 2 are true and accurate Xerox copies of what they purport to be." (Emphasis added.)

From the foregoing stipulation, the State and the defendant agreed, and it was undisputed and uncontradicted that (1) shoe print No. 1 from the burglary scene measured nine inches in length and three inches in width; (2) the other shoe print, No. 2, measured 9½ inches in length and 3½ inches in width; (3) the shoe of the 6-foot, 1-inch tall and 210-pound defendant measured over 12 inches in length; and (4) "the shoe of defendant James Jefferson did not make the shoe prints number 1 and number 2 in the snow leading to the point of entry and leaving from the point of exit" of the burglarized premises.

The State did not contend in the trial court or in this court that the defendant's gym shoes submitted by the defendant's relatives to the police could have made the shoe prints in the snow at the burglarized premises.

After the attorney's closing argument, the trial court completely ignored the uncontradicted stipulated evidence, created evidence of its own and resorted to convoluted reasoning and conclusions, totally unsupported by the evidence, in order to find and in finding the defendant guilty. The trial court concluded, and the following colloquy occurred:

"THE COURT: With respect to the variance in the shoe sizes. I would indicate that the defendant never had the shoes that he was wearing tested against the impressions that were found at the scene.

MR. KULL [Defense Attorney]: Excuse me Judge. That is just not the evidence. That is exactly what the stipulation says that the gym shoes were tested against that stuff.

MR. CALLAGHAN [Prosecuting Attorney]: Shoes that he is wearing.

MR. KULL: That's a gym shoe.

THE COURT: I'm well aware of what you are saying. The shoe that was furnished to the police was furnished by the defendant's family and that was the shoe that was used as the basis of comparison. The clothing that was furnished by the

defendant's family did not comport to the clothing identified by the witness, but I can well appreciate that since the shoe was furnished by a member of the family allegedly attributable to the defendant may or may not have measured up to the impression that was ultimately found and that is the basis for my observations, counsel. *** I do find the defendant guilty of the offense of residential burglary ***."

The defendant vociferously insists that the inaccurate, unreliable and untrustworthy description and identification evidence, and the trial court's foregoing remarks disregarding evidence favorable to the defendant and creating evidence unfavorable to him, profoundly demonstrate the trial court's resolve and determination to find the defendant guilty, regardless of the evidence and in spite of the law.

First, regarding the trial court's comments on the shoes the defendant wore in the courtroom, that the defendant "never had *** tested against the impressions that were found at the scene," the comment is totally unsupported by the evidence. No evidence whatsoever was presented on whether the defendant did or did not have the shoes that he wore in the courtroom tested against the impressions that were found at the scene. The record is completely silent on the point. The trial court therefore clearly erred in considering and relying on its own created and evidentially unsupported comment.

In *People v. Wallenberg* (1962), 24 Ill. 2d 350, 353-54, the supreme court held:

"[T]he court erred in considering matters which were not properly in the record. ***

During the pronouncement of the guilty verdict, the court commented on the testimony of the defendant and said: 'He told me there were no gas stations on that stretch of the street where he could get air. I happen to know different. I don't believe his story.' There had been no evidence introduced to rebut the defendant's testimony that there were no gas stations along the route he travelled.

This court has held that the deliberations of the trial judge are limited to the record made before him during the course of the trial. A determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law. [Citations.]

* * *

*** It is true that the robbery victim made a positive and

unequivocal identification of the two defendants, and that a currency exchange receipt dropped at the scene of the robbery was linked to Wallenberg. While the evidence appearing in the record may be sufficient to establish the guilt of the defendant, the credibility of defendant and the defense of alibi were minimized and, in fact, entirely negated by the trial court's resort to personal beliefs.

\* \* \*

\*\*\* Under the circumstances there is no alternative but to reverse and remand for a new trial."

Although the trial court's evidentially baseless comments in the case at bar, that the defendant never had the shoes he wore in court tested against the impressions found at the scene, may not have negated the defendant's alibi defense, as was done by the trial court in *Wallenberg*, nevertheless the trial court's consideration of and reliance on the defendant's failure to have submitted his courtroom shoes for testing, completely unsupported by the record, illegally and unconstitutionally negated his defense evidence that his shoe submitted for comparison purposes did not make the shoe prints found at the burglary scene.

In *People v. Harris* (1974), 57 Ill. 2d 228, a bench trial for auto theft, the trial judge asked the defense counsel if the defendants had told the public defender's office during their trial on another charge, or when they first saw a public defender, if they had been to a party on the evening in question. Defense counsel answered yes to the trial court's first inquiry and that he did not know to the second. The trial court thereupon stated, "Then I can't believe them [the defendants]," and found them guilty. In reversing the defendants' convictions, the supreme court held:

"[A] trial judge in his deliberations is limited to the record made before him at trial and should he draw conclusions based on any private investigation made by him the accused will have been denied due process of law. [Citation.] The trial court here was in effect conducting a private investigation through its questioning of the defense attorney, and it is clear it was improperly considering matters not in evidence before it \*\*\*." 57 Ill. 2d at 231.

In *People v. Yarbrough* (1982), 93 Ill. 2d 421, immediately after the jury's guilty verdict, the trial judge suggested that the prosecutor give the defendant a polygraph examination and then withheld decision on the defendant's post-trial motions until after inquiring into the results of the exam. The supreme court concluded that the record

showed that the prosecutor conveyed to the trial court the message that the exam had been taken and that the results were not beneficial to the defendant. In reversing the defendant's conviction, the supreme court held:

"Regardless of the standards a trial judge should follow in reviewing the sufficiency of the evidence, it is clear that the judge is confined to the record before him and his impressions of the witnesses. Due process does not permit him to go outside the record *** or conduct a private investigation in a search for aids to help him make up his mind about the sufficiency of the evidence. ***

The rule prohibiting a judge from referring to matters outside the record in disposing of a motion for a new trial obviously precludes reference to the results of a polygraph test which was not offered at trial and which would have been inadmissible if offered. The trial judge has failed to discharge his obligation to appraise the sufficiency of the evidence without going outside the record for assistance. *** The trial judge has the inherent power to grant a new trial [citation], and in determining whether to exercise that power he must confine himself to the record. The defendant was entitled to a decision of the trial judge on his motion for a new trial ***." 93 Ill. 2d at 429-30.

The trial court in the case at bar likewise failed to discharge his obligation to appraise the sufficiency of the evidence without going outside the record for assistance. The defendant in the case at bar was also entitled to a decision by the trial judge of innocence or guilt arrived at in a proper manner, exclusively from a proper appraisal of only the evidence in the record.

Second, the trial court comments establish that the trial court erroneously assumed that the burden was on the defendant to prove that his courtroom shoes would not match and did not make the impressions at the scene of the burglary. It was the State's unremitted burden to prove that the footprints at the burglary scene were made by and were the defendant's footprints.

Third, pursuant to the State's burden of proof, had the State desired to have the shoes worn by the defendant during his court appearances tested against the shoe impressions found at the burglary scene, the State need only have made a request for the shoes for it to make such a comparison, under the authority and provisions of Illinois Supreme Court discovery Rule 413(e) (107 Ill. 2d R. 413(e)), which provides, "[u]pon a showing of materiality, and if the request is rea-

sonable, the court in its discretion may require disclosure to the State of relevant material and information." The State made no such request. Any valid unfavorable inference to be drawn from the failure to have had the defendant's courtroom shoes compared with the shoe prints at the burglary scene must be drawn against the State, and not against the defendant. The trial court clearly erred when it expressly and contrarily so inferred against the defendant.

Fourth, the trial court was also in gross and grievous error when it unjustifiably speculated that "since the [defendant's] shoe was furnished [for comparison] by a member of the [defendant's] family allegedly attributable to the defendant may or may not have measured up to the impression that was ultimately found." Here again, this evidentially unsupported factual conjecture by the trial court violated constitutional due process and the mandate of the supreme court in *Wallenberg, Harris,* and *Yarbrough.* Additionally, this wholly unwarranted and invalid speculation by the trial court was also contrary to the uncontradicted, agreed and stipulated evidence "that the shoe of defendant James Jefferson did not make the shoe prints number 1 and number 2 in the snow leading to the point of entry and leaving from the point of exit" of the burglarized premises. This theorization by the trial court, adverse to the stipulated facts, was clearly erroneous.

In *People v. Joe* (1984), 31 Ill. 2d 220, 226, the defendant, convicted of murder, argued before the supreme court, which was contrary to the stipulated facts in the trial court, that there was no evidence that the body upon which the coroner performed the autopsy was that of the person the defendant was convicted of murdering. The supreme court rejected the defendant's attempt to renege on his trial court stipulation and agreement that the coroner if called upon would testify that he performed an autopsy on the body of Andrew Waite, the alleged murder victim, and that in his opinion he died from a stab wound in the neck, and held that "[a] stipulation is to be given its natural and ordinary meaning." (31 Ill. 2d at 226.) The defendant in *Joe* was prohibited from rejecting reasonable, uncontradicted, agreed and stipulated facts. In the case at bar, the trial court was likewise prohibited from rejecting reasonable, uncontradicted, agreed and stipulated facts.

In *People v. McAllister* (1975), 31 Ill. App. 3d 825, 826-27, 334 N.E.2d 885, rejecting the trial court's stipulation, the defendant argued for reversal of his theft conviction that there was no evidence of the existence of the corporate entity of the alleged theft victim. The court disagreed, refused to permit the defendant to renege on his trial court factual agreement and stated, "A stipulation should be

given its natural and ordinary meaning and construed in the way in which it was intended by the parties." (31 Ill. App. 3d at 826-27.) In the case at bar the trial court erred in refusing to give the stipulation its expressed, natural and ordinary meaning and in refusing to construe the stipulated and agreed facts in a way in which it was entered by the parties.

Fifth, the trial court's inference that the defendant's family was engaged in some diabolical conspiracy to thwart the investigation, deceive the police and assist the defendant by furnishing them a shoe that did not belong to the defendant, or, more importantly, that was larger than and would not fit the shoe print found at the burglary scene was not only unsupported by the evidence, but it was also against and contrary to the evidence of how the police came into possession of the defendant's gym shoe. Detective Rydz, who was responsible for the investigation of the burglary, who requested the defendant's relatives to bring clothes for the defendant to wear at the lineup, and who conducted the lineup, testified:

"Q. *** [D]uring your investigation were you ever submitted a pair of gym-type shoes from the defendant?

A. Yes, sir, I was.

Q. And how did they get to you?

A. A member of his family brought them to the department while he was in custody there.

\* \* \*

Q. Did they bring that gym shoe at your request?

A. No, sir.

\* \* \*

Q. Where did the gym shoe come from?

A. I had asked for clothing from the family so it would be unconspicuous as to his involvement in the lineup.

Q. So when you talked to the family, you said to bring him stuff that he wears so he can stand in a lineup?

A. That's what I told them.

\* \* \*

Q. Is there some restriction to him wearing black shoes that you told him to wear gym shoes or a different pair of shoes?

A. I didn't ask for the gym shoes.

Q. You asked them to bring clothing, including gym shoes, didn't you?

A. No, sir.

Q. You just asked them to bring clothing?

A. Yes, sir."

There is no evidence in the record which suggests that the defendant's relatives knew that shoe prints were discovered at the burglary scene, or that the defendant's shoes were to be compared with shoe prints discovered at the burglary scene, or that the defendant's family attempted to defeat an accurate shoe print comparison. The trial court's expressed contrary inference was without any evidence to support it. The inference was therefore erroneous and improper, and the trial court clearly erred in relying on such inference.

The majority's conclusion that "the trial court could have found that one of the sets of shoe prints belonged to defendant" (183 Ill. App. 3d at 501) is likewise not only without any evidentiary support, but it is also contrary to the undisputed, stipulated and agreed evidence that the defendant's shoes did not make the shoe prints discovered at the burglary scene. The majority, however, conversely admits that "the officer also concluded that defendant's shoe did not make the two measured shoe prints." (183 Ill. App. 3d at 501.) Nevertheless, the majority erroneously concludes that "the trial court was not required to accept the officer's conclusion as authoritative." (183 Ill. App. 3d at 501.) That a trial court lawfully cannot arbitrarily and ostensibly ignore or reject reasonable, pertinent, uncontradicted, agreed and stipulated evidence need not be further discussed.

The majority in the case at bar further erroneously concludes that "there was no showing that the shoe prints were made by the burglars." (183 Ill. App. 3d at 501.) This conclusion by the majority is contrary to the undisputed, stipulated evidence that the shoe prints "proceeded from the alley in the rear of the residence to the kitchen window and then away from the back door [of the residence back] to the alley," and that "the point of entry [of the offenders] was the kitchen window" described above and that the point of exit was the back door described above. (183 Ill. App. 3d at 500.) The investigating and expert police officers concluded that the shoe prints were made by the burglars, the prosecuting and defense trial attorneys and the trial court agreed that the shoe prints were made by the burglars, and the prosecuting and defense appellate attorneys also agreed that the shoe prints were made by the burglars. No contrary contention has been made by any party in the trial court or in this court. Yet, contrary to the evidence and the contentions of the parties in the trial court and in this court, the majority concludes for the first time and *sua sponte* that there was no showing that the shoe prints were made by the burglars. Regarding this shoe print evidence, the majority has distorted some facts, ignored others and then created and relied on convoluted rationale to justify and affirm the trial court's aberrations.

## VII

### CONCLUSION

The totality of the circumstances of the witness' observation of the burglars was inadequate for a reliable and trustworthy identification. The witness' prior description of the burglar did not describe the defendant and was such that it established that the defendant was not the burglar. There was no corroboration of the witness' unreliable, unsatisfactory and inaccurate identification of the defendant as the burglar. None of the burglary proceeds, nor the burglar's clothing or car were shown to have been connected with the defendant. The trial court erroneously ignored the shoe print evidence of the defendant's innocence, and instead unlawfully concocted its own evidence on which it found the defendant guilty, of which the majority invalidly approves. The evidence does not prove the defendant guilty beyond a reasonable doubt; rather, the evidence establishes beyond a reasonable doubt that the defendant did not commit the burglary. His conviction should therefore be reversed. Accordingly, I dissent.